FILED
2025 Jul-21 PM 12:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA

|  |  |
|---|---|
| VERONICA CURTIS-RICHIE, ANGELA CURRY, and THE ALABAMA STATE CONFERENCE OF THE NAACP, <br><br> *Plaintiffs*, <br><br> v. <br><br> MADISON COUNTY COMMISSION; TOM BRANDON, in his official capacity; VIOLET EDWARDS, in her official capacity; STEVE HARAWAY, in his official capacity; CRAIG HILL, in his official capacity; MAC MCCUTCHEON, in his official capacity; PHIL RIDDICK, in his official capacity; PHIL VANDIVER in his official capacity; and FRANK BARGER in his official capacity, <br><br> *Defendants*. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## CORRECTED FIRST AMENDED COMPLAINT

1.      Plaintiffs Veronica Curtis-Richie, Angela Curry, and the Alabama State Conference of the NAACP, on behalf of its members, (collectively, "Plaintiffs") bring this action under Section 2 of the Voting Rights Act of 1965 ("VRA") for declaratory and injunctive relief against the Madison County Commission (the

"Commission"), Commissioners Tom Brandon, Violet Edwards, Steve Haraway, Craig Hill, Mac McCutcheon, Phil Riddick, Phil Vandiver, and Probate Judge Frank Barger in their official capacities (collectively, "Defendants"). Plaintiffs seek an injunction barring Defendants from using the current system of electing commissioners from one at-large seat and six single-member districts, and ordering Defendants to employ a plan with two districts where Black voters have an opportunity to elect candidates of their choice.

2.      The current districting structure for the Madison County Commission (the "Enacted Plan") denies Madison County's Black citizens an equal opportunity to participate in the political process and elect candidates of their choice, in violation of Section 2 of the VRA, 52 U.S.C. § 10301; 42 U.S.C. § 1983.

3.      Until 1988, all commissioners were elected through a "pure" at-large voting system. Under this at-large system, the votes of Black voters were canceled out by the White majority who voted as a bloc to defeat Black preferred candidates, and no Black commissioner had ever been elected to any of the Commission's seats.

4.      In 1988, after Black voters filed a lawsuit under Section 2, the parties entered into a consent order that expanded the size of the Commission to seven commissioners, with six commissioners elected from single-member districts and the seventh commissioner (designated the Commission's Chair) elected at-large.

2

5.      Since the establishment of the 6-1 plan in 1988, the Commission has drawn one—but only one—majority-Black single member district (District 6) where Black voters have an opportunity to elect their candidate of choice. Black candidates who are the preferred candidates of choice of Black voters have consistently won in majority-Black District 6.

6.      No Black candidate, however, has ever won an election to the at-large chair position, nor has any Black candidate ever won in any of the five majority-White single-member districts.

7.      On January 19, 2022, following the 2020 decennial Census, the Commission again redrew its 6-1 plan to account for population changes since 2010 (the "Enacted Plan"). The Enacted Plan continues to follow a 6-1 structure, and continues to contain only one majority-Black district. The Enacted Plan fails to provide Black voters with an equal opportunity to participate in the political process and elect their candidates of choice to the Commission.

8.      Voting is racially polarized across Madison County with Black voters strongly preferring different candidates than White voters, and White people voting as a bloc to defeat Black-preferred candidates. Moreover, Madison County has a history of discrimination against Black residents in voting, education, and other areas and a history of being unresponsiveness to the needs of Black people, resulting in stark racial disparities in socioeconomic status and voter participation. Racial

polarization, past and present discrimination, and other factors have combined to effectively lock Black voters out of the political system beyond their limited representation in District 6.

9.    As of the 2020 Census, White voters constitute about 63.67% of Madison County's voting-age population and Black voters make up about 24.53% thereof. Despite this, the Enacted Plan, in conjunction with racially polarized voting, ensures that White voters control about 86% of the Commission seats whereas Black voters have an opportunity to elect a candidate of their choice in only 14% of the Commission's seven seats.

10.    District 6 has a 64.45% Black voting-age population ("BVAP"). For decades, the Commission has intentionally "packed" District 6 with Black voters in numbers far higher than are necessary to ensure the Commission's compliance with the VRA or otherwise needed to provide Black voters with an opportunity to elect candidates of their choice. The Commission also needlessly and intentionally "cracks" the Black community in the City of Huntsville in a way that prevents Black voters from electing a candidate of their choice in a second district. In the absence of the Commission's packing and cracking, Black voters are sufficiently numerous and geographically compact enough to constitute effective majorities in two of the six reasonably configured single-member districts with one at-large chairperson.

11.     In the alternative, if the at-large chairperson position were eliminated and all seven commissioners were elected from single-member districts, Black voters could also form the majority in two reasonably configured majority-Black districts, enabling the election of a second candidate preferred by Black voters.

12.     Accordingly, Plaintiffs bring this suit to challenge the Enacted Plan as a violation of Section 2 of the VRA. 52 U.S.C. § 10301; 42 U.S.C. § 1983.

13.     The Court should enjoin the Enacted Plan and order a remedial plan that completely cures the unlawful vote dilution by establishing two districts in which Black voters have an opportunity to elect the candidates of their choice to the Commission.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331, 1343, and 1357 because the matters in controversy arise under the laws of the United States, as well as under 42 U.S.C. §§ 1983 and 1988 and 52 U.S.C. §§ 10301 and 10308(f).

15.     This Court has jurisdiction to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

16.     This Court has personal jurisdiction over Defendants, all of whom are located in Alabama.

17. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district and because at least one Defendant resides in this district.

## PARTIES

18. Plaintiff Veronica Curtis-Richie is Black, an American citizen, and a lawfully registered voter in District 6 under the Enacted Plan and a resident of Madison County. The Enacted Plan has denied or abridged Mrs. Curtis-Richie's right to the equal opportunity to participate in the political process and elect her preferred representatives to the Commission. Mrs. Curtis-Richie resides in an area of Madison County that could constitute an additional reasonably configured single-member district with a majority-Black voting-age population that, if established, would remedy the identified Section 2 violation.

19. Plaintiff Angela Curry is Black, an American citizen, and a lawfully registered voter in District 6 under the Enacted Plan and a resident of Madison County. The Enacted Plan has denied or abridged Ms. Curry's right to the equal opportunity to participate in the political process and elect her preferred representatives to the Commission. Ms. Curry resides in an area of Madison County that could constitute an additional reasonably configured single-member district with a majority-Black voting-age population that, if established, would remedy the identified Section 2 violation.

6

20. Plaintiff Alabama State Conference of the NAACP ("Alabama NAACP") is the state conference of the National Association for the Advancement of Colored People, Inc. The Alabama NAACP is the oldest and one of the most significant civil rights organizations in Alabama. It works to ensure the political, educational, social, and economic equality of Black Americans and all other Americans. Two central goals of the Alabama NAACP are to eliminate racial discrimination in the democratic process and to enforce federal laws and constitutional provisions securing voting rights. Toward those ends, the Alabama NAACP has participated in numerous lawsuits to protect the right to vote, regularly engages in efforts to register and educate Black voters, and encourages Black voters in Madison County and elsewhere to engage in the political process by turning out to vote.

21. The Alabama NAACP is a membership organization with thousands of members across the State, nearly all of whom identify as Black and most of whom are lawfully registered voters. The Alabama NAACP's members include Black people who are American citizens and lawfully registered voters in Madison County whose voting strength is currently diluted by the Enacted Plan in violation of Section 2. Members of the Alabama NAACP reside and vote in areas of Madison County that could constitute a second reasonably configured single-member district with an

7

effective majority-Black voting-age population or a second Black opportunity district that, if established, would remedy the identified violation of Section 2.

22.    Defendant Madison County Commission is the governing body of Madison County, Alabama. The Commission is responsible for administering elections in the county. The Commission's election administration responsibilities include, but are not limited to, validating and canvassing election returns and ballots, Ala. Code § 17-12-1 *et seq.*, creating election precincts, Ala. Code § 17-6-2, determining poll locations, Ala. Code § 17-6-4(a), appointing poll workers, Ala. Code § 17-8-1(a), securing election machines, Ala. Code § 17-7-1, and providing adequate funding for elections, Ala. Code §§ 17-8-12, 45-45-111. The Commission consists of six commissioners elected from single-member districts and one chairperson elected at-large. The Commission's chairperson plays a legislative role nearly identical to the other members of the Commission, except that he presides at Commission meetings and votes on matters only in case of a tie vote. The Commission prepared, developed, and drew the Enacted Plan based on the 2020 Census. The Commission has the discretion and authority to adopt nondiscriminatory districts. *See* Ala. Code § 11-3-1.1(a). The Commission approved and adopted the Enacted Plan.

23.    Defendant Mac McCutheon is Chairman of the Madison County Commission and is sued in his official capacity.

24.    Defendant Tom Brandon is the elected Commissioner for District 1 and is sued in his official capacity.

25.    Defendant Steve Haraway is the elected Commissioner for District 2 and is sued in his official capacity.

26.    Defendant Craig Hill is the elected Commissioner for District 3 and is sued in his official capacity.

27.    Defendant Phil Vandiver is the elected Commissioner for District 4 and is sued in his official capacity.

28.    Defendant Phil Riddick is the elected Commissioner for District 5 and is sued in his official capacity.

29.    Defendant Violet Edwards is the elected Commissioner for District 6 and is sued in her official capacity.

30.    Defendant Frank Barger is the elected Judge of Probate and is sued in his official capacity.

## STATEMENT OF FACTS

### The Madison County Commission and its Adoption of the Enacted Plan

31.    Under the system of at-large voting through which all Madison County Commissioners were elected prior to 1988, *see* Ala. Code § 11-3-1(c), the votes of Black voters were canceled out by the White majority who voted as a bloc to defeat Black and Black-preferred candidates.

9

32.    In the 1980 census, Black people comprised about 20% of Madison County's total population. U.S. Census Bureau, *General Population Characteristics: Alabama* 2-16, tbl.15.[1] In 1984, Black voters filed a lawsuit under Section 2 to challenge the Commission's at-large election system. *See* Compl., *Grayson v. Madison Cnty., et al.*, No. 5:84-CV-05770-RSV (N.D. Ala. Oct. 31, 1984). In 1988, the parties agreed to a consent order leading to the current "6-1" or "mixed" plan. The consent order expanded the size of the Commission to seven commissioners, with six commissioners elected from single-member districts and a seventh elected at-large. *See* Ex. 1, Order, *Grayson v. Madison Cnty. et al.*, No. 5:84-CV-05770-RSV (N.D. Ala. Jan. 27, 1989) (approving provisional consent order for 6-1 plan enacted in 1988). Under the consent order, District 6 had a Black population of 60.28% based on the 1980 census. *Id*. at 23. Each of the other six single-member districts had a Black population ranging from as low as 2.65% to as high as 28.99%. *Id.*

33.    In the 1988 elections under this plan, Prince Preyer was elected to District 6, becoming the first Black Commissioner in Madison County. Since 1988, Black candidates who are the preferred candidates of Black voters have consistently been elected from the majority-Black District 6. But no Black person has ever been

---

[1] https://www2.census.gov/prod2/decennial/documents/1980a_alABC-02.pdf.

elected to the Commission to serve as the at-large chair or to represent the other majority-White single-member districts.

34.    Since 1988, the Commission has continued to follow a 6-1 plan. In 2006, the Alabama Legislature passed Act 2006-252, codified at Alabama Code § 11-80-12, which made the consent order's 6-1 plan the method under state law for electing the Madison County Commission. Nothing in the consent order or state law requires that the Commission maintain certain racial population percentages, or the specific boundaries of the districts described in the consent order. *See id.*

35.    Under Alabama law, following the release of federal decennial census data, any county commission that elects its members from single-member districts may alter the boundaries of its districts. Ala. Code § 11-3-1.1(a); *see* Ala. Code § 45-37-72(b). Federal constitutional law also requires redrawing district boundaries if there is a significant population shift. *See Avery v. Midland Cnty.*, 390 U.S. 474 (1968). County commissions are also authorized to set precinct boundaries after the census. Ala. Code § 17-6-2(a).

36.    After the 2020 Census, the Madison County Commission had the opportunity to revise its districting map to account for population changes since 2010.

37.    Accordingly, in 2019 and again in 2021, Plaintiff Alabama NAACP sent letters urging the Commission to adopt a district plan that contains two commission

11

districts where Black voters have an opportunity to elect candidates of their choice in compliance with Section 2.

38.    On January 19, 2022, however, the Commission approved the Enacted Plan, which updated district lines to account for population changes, but maintained a 6-1 structure without adding a second district where Black voters have an opportunity to elect candidates of their choice.

39.    Under the Enacted Plan, Black voters continue to have the opportunity to elect a candidate of their choice to only one of the Commission's seven seats, District 6.

40.    Madison County's voting-age population is 24.53% Black and 63.67% White. In the Enacted Plan, the chairperson is elected at-large by all the voters in the county. No Black person has ever been elected as the Commission's at-large chair.

41.    The voting-age population ("VAP") of District 1 is approximately 76% White and 15% Black; the VAP of District 2 is about 64% White and 21% Black; the VAP of District 3 is approximately 82% White and 8% Black; the VAP of District 4 is about 64% White and 25% Black; the VAP of District 5 is around 72% White and 13% Black; and the VAP of District 6 is about 26% White and 64% Black.

42.    As alleged further below, the Enacted Plan violates Section 2 of the VRA because it fails to ensure that Black voters have an equal opportunity to

participate in the political process and elect their candidates of choice to the Commission in at least two single-member districts.

## Section 2 of the Voting Rights Act

43.    Section 2 prohibits Defendants from enforcing any "voting qualification or prerequisite to voting or standard, practice, or procedure" that results in the denial or abridgment of the right to vote "on account of race or color." 52 U.S.C. § 10301(a). Methods-of-election that result in vote dilution of minority voters are classic voting procedures that may be challenged under Section 2 and must be changed. *See, e.g.*, *Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347, 1357 (M.D. Ala. 1986).

44.    Discriminatory intent is not required to establish a Section 2 violation: Plaintiffs can "either prove such intent, or alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process." *Chisom v. Roemer*, 501 U.S. 380, 394 & n.21 (1991) (citation omitted).

45.    Section 2 prohibits vote dilution: the use of electoral schemes that minimize or cancel out Black voting strength and otherwise deny or abridge Black voters' right to an equal opportunity to participate in the political process and elect representatives of their choice. 52 U.S.C. § 10301(b).

13

**Plaintiffs Satisfy the Three *Gingles* Preconditions for Proving a Vote Dilution Claim under Section 2 of the Voting Rights Act**

46.    In *Thornburg v. Gingles*, the U.S. Supreme Court identified three preconditions, each of which Plaintiffs satisfy, necessary for a claim that a voting practice results in an actionable vote dilution claim under Section 2: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the minority group must be "politically cohesive," and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. 30, 50–51 (1986).

**_Gingles_ I: Black Voters Could Form the Majority in a Second District, Enabling the Election of a Second Candidate Preferred by Black Voters**

47.    Under the Enacted Plan, which continues to follow a 6-1 structure, Black voters constitute a majority in only one of the six single-member districts (District 6), while the seventh commissioner is elected at-large as the chairperson.

48.    As of the 2020 Census, the Black voting-age population in Madison County is 24.53%. The non-Hispanic White voting-age population of Madison County is approximately 64%, and Hispanic people are about 5% of Madison County's voting-age population.

49.    The Enacted Plan illegally and artificially limits Black voters' influence by "packing" Black voters into a single majority-Black district, District 6. Approximately 64% of District 6's voting-age population is Black, substantially

14

higher than necessary to elect candidates of choice. Rather, Black voters in Madison County can elect their candidates of choice from commission districts with Black voting-age populations around 50%. By reducing the packing of Black voters in District 6, it is possible to draw a second reasonably configured single-member majority-Black district in either a seven single-member district plan or a six single-member district plan retaining the at-large chairperson position.

50.     If the at-large position is eliminated, the Black total and voting-age population in Madison County is sufficiently numerous and geographically compact enough to allow for the creation of two reasonably configured single-member districts for the Commission where Black voters would have the effective opportunity to elect the candidates of their choice.

51.     In this illustrative plan, the new majority-Black district could encompass north Huntsville, including some neighborhoods that are in Enacted District 6, as well as additional areas west and north of Huntsville that are not part of Enacted District 6, including all of Harvest. The Enacted District 6 could remain entirely within the city limits of Huntsville, and extend south from downtown to neighborhoods near Redstone Arsenal.

52.     In this illustrative plan, all districts are contiguous, reasonably compact under objective metrics (*e.g.*, Reock score), and as respectful of political lines as the Enacted Plan. This illustrative plan could have a population deviation of 7.19%; and

respects communities of actual shared interest by keeping together areas, towns, and cities with shared infrastructure, economic, religious, entertainment, and cultural connections. It is possible to devise other illustrative plans containing two majority-Black districts among seven single-member districts.

53.    Alternatively, if the at-large chair were maintained, the Commission could still create two districts where the Black total and voting-age population in Madison County is sufficiently numerous and geographically compact enough to allow for the creation of two reasonably configured single-member districts where Black voters would have the effective opportunity to elect the candidates of their choice.

54.    In this illustrative plan, a majority-Black district could include areas west and north of Huntsville, and extend southwest beyond the Huntsville City limits to include the Redstone Arsenal and Triana area. A second majority-Black district could be drawn including central and west areas of Huntsville, and extending further northwest along U.S. Highway 53.

55.    In this illustrative plan, all districts are contiguous, reasonably compact under objective metrics (*e.g.*, Reock score), and as respectful of political lines as the Enacted Plan. This illustrative plan could have a total population deviation of 9.25%; and respects communities of actual shared interest by keeping together areas, towns, and cities with shared infrastructure, economic, religious, entertainment, and cultural

connections. It is possible to devise other illustrative plans containing two majority-Black districts among six single-member districts.

**Gingles II and III: Voting is Racially Polarized in Madison County**

56.    Voting is racially polarized in Madison County. Even as Black voters have supported Black candidates (demonstrating Black voter cohesion), Black candidates have lost recent general and primary elections against White candidates for at-large countywide positions and from single-member districts in which White voters are in the majority (indicating that White voters tend to vote against Black voters' preferred candidates).

57.    Black candidates who are the preferred candidates of Black voters in Madison County have consistently lost due to racially polarized voting in local elections. For example, in 2018, Black candidates Michael Walker and Deborah Barros lost races for Madison County probate judge and State Senate District No. 7, respectively, against White candidates. Like the Commission chair, the probate judge is elected at-large by all voters in Madison County. State Senate District 7 is entirely within Madison County. The Black candidates in these races were overwhelmingly the preferred candidates of choice for Black voters, and White people voted as a bloc against these candidates. Mr. Walker lost his election by a 10% margin of victory. Ms. Barros lost her race by a 10.5% margin of victory. Similarly, in the 2014 election for Madison County Tax Assessor, Patrick Douglass,

17

a Black person and the Black candidate of choice, lost to his White opponent by a 26.7% margin of victory.

58.    Black candidates who are the preferred candidates of Black voters in Madison County have also consistently lost due to racially polarized voting in statewide elections. In the 2022 election for Governor, Yolanda Flowers, a Black person who was the candidate of choice of Black voters, lost Madison County to her White opponent who won with a 46.8% margin of victory in a racially polarized election. In the 2022 election for U.S. Senate, Will Boyd, a Black person who was the candidate of choice of Black voters, lost Madison County to his White opponent who won with a 42.6% margin of victory in a racially polarized election. In the 2022 election for Attorney General, Wendell Major, a Black person who was the candidate of choice of Black voters, lost Madison County to his White opponent who won with a margin of victory of 41.2% in a racially polarized election. In the 2022 election for Secretary of State, Pamela Laffitte, a Black person who was the candidate of choice of Black voters, lost Madison County to her White opponent who won with a margin of victory of 41.6% in a racially polarized election. In the 2022 election for Supreme Court, Place 5, Anita Kelly, a Black person who was the candidate of choice of Black voters, lost Madison County to his White opponent who won with a margin of victory of 40% in a racially polarized election. In the 2018 election for Lieutenant Governor of Alabama, Will Boyd, a Black person who was the candidate of choice

of Black voters, lost Madison County to his White opponent who won with a margin of victory of 30.8% in a racially polarized election. In the 2008 and 2012 general elections, President Barack Obama lost Madison County. He received nearly 100% of the votes of Black people, whereas about 83% of White voters supported his White opponents. Other statewide elections had similar levels of racial polarization.

**The Totality of the Circumstances Demonstrates that the Enacted Plan Prevents Black Voters in Madison County from Participating in the Political Process on Equal Terms and Electing Representatives of Choice**

59.    In addition to the three *Gingles* requirements, Plaintiffs must also demonstrate that the "totality of the circumstances results in an unequal opportunity for minority voters to participate in the political process and to elect representatives of their choosing as compared to other members of the electorate." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015).

60.    To undertake the totality-of-the-circumstances determination, courts use factors drawn from a report of the Senate Judiciary Committee accompanying the 1983 amendments to the VRA, *i.e.*, the "Senate Factors." *Id.* But courts are not limited to solely considering these factors, nor is there a requirement that "any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* (internal citations and quotation marks omitted).

61.     As explained below, there is powerful evidence establishing that, under the totality of the circumstances, the political process is not equally open to Black voters in Madison County.

**Senate Factor 1: History of Discriminatory Voting Practices that Enhance the Opportunity for Discrimination Against Black Voters**

62.     At different points in history, the State of Alabama has used poll taxes, literacy tests, felony disfranchisement laws, and discriminatory redistricting schemes to restrict access to the franchise for Black voters in Madison County and across the State. *See, e.g.*, *Allen v. Milligan*, 599 U.S. 1 (2023); *Hunter v. Underwood*, 471 U.S. 222 (1985); *Ala. State Conf. of NAACP v. Marshall*, No. 2:24-CV-00420, 2024 WL 4282082 (N.D. Ala. Sept. 24, 2024); *Singleton v. Allen*, 690 F. Supp. 3d 1226 (N.D. Ala. 2023) (three-judge court); *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1173–74 (N.D. Ala. 2020); *Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026 (M.D. Ala. 2017); *United States v. McGregor*, 824 F. Supp. 2d 1339, 1346–47 (M.D. Ala. 2011) (collecting cases). For example, in *Alabama Legislative Black Caucus v. Alabama* ("*ALBC*"), a three-judge court found that the Alabama Legislature discriminated against Black voters in Madison County by unnecessarily packing Black voters into House District 53. 231 F. Supp. 3d at 1185.

63.     Because of this history of discrimination in voting, Alabama and Madison County were subject to the preclearance requirement under Section 5 of the Voting Rights Act.

21

64.    This history has also impacted the Commission. In 1986, a federal district court found that the Alabama Legislature had purposefully changed the state laws governing at-large elections for county and city governments throughout Alabama to require the use of numbered places and had deployed at-large election schemes to prevent Black voters from electing candidates of their choice. *See Dillard*, 640 F. Supp. at 1356–60; *see also Dillard v. Crenshaw Cnty.*, 649 F. Supp. 289, 294–95 (M.D. Ala. 1986), *aff'd* 831 F.2d 246, 250 (11th Cir. 1987). Based on these findings, the court expanded *Dillard* to include a defendant class of 19 county commissions, 30 county school boards, and 148 cities who were then employing at-large election systems tainted by these racially motivated election laws.

65.    While not part of the *Dillard* defendant class, the Commission and other elected bodies in Madison County have operated under the intentionally discriminatory laws described above. Prior to Black voters' success in the *Grayson* litigation, no Black candidate had ever been elected to office under the racially discriminatory at-large methods of electing the Commission, the Madison County school board, the Huntsville city council, and the Huntsville school board.

### Senate Factors 2 and 3: Racially Polarized Voting and Voting Practices that Enhance the Opportunity for Discrimination Against Black Voters

66.    As described above, voting in Madison County is racially polarized.

67.     The Commission uses several practices and procedures, including the at-large method of electing the chair, majority-vote requirements, and the packing of Black voters into District 6, that enhance the opportunity for discrimination against Black voters.

68.     Majority-vote requirements dilute the vote of Black people because Black-preferred candidates for the Commission, even with cohesive support from Black voters, cannot win a majority of the total vote in at-large elections without White crossover voting, which does not occur at a meaningful level in Madison County.

### Senate Factor 5: Discrimination in Other Areas

69.     As described, there is an extensive history of racial discrimination in voting, education, and other areas against Black people in Madison County.

70.     Black residents of the County bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process. The Commission's election system interacts with these social and historical conditions to undermine the ability of the Black citizens in the county to participate equally in the political process. For example, the U.S. Census's 2021 American Community Survey shows that 47.6% of the County's White residents, but just 34.2% of Black residents had a bachelor's degree or higher education; and 11.6% of Black people, but only 6.2% of White people had not

finished high school. The Black median family income per year ($56,899) is nearly half that of White families ($105,202). Further, 17% of Black families, but only 4% of White families lived below the poverty line in the last year. Among the working age population (ages 16 and older), 7% of Black people and just 3% of White people are unemployed. U.S. Census Bureau, 2021 Am. Community Survey 5-Year Estimates.

71.    The Madison County Board of Education and the City of Madison remain subject to desegregation orders. In 2022, the county school board entered into a consent order in the desegregation litigation to address persistent racial discrimination and disparities in student discipline, faculty and staff employment, hiring, and retention, and access to gifted and talented services and other academic programming. *See* Order, *Bennett v. Madison Cnty. Bd. of Educ.*, No. 5:63-CV-00613-MHH, ECF No. 199 (N.D. Ala. July 5, 2022).

72.    The Commission has remained actively involved in important decisions impacting Madison County's open desegregation order, including the siting of a new high school.

73.    The Huntsville city school system also remains subject to a desegregation order. In recent years, the district court in *Hereford v. Huntsville Board of Education*, No. 5:63-CV-00109, has found that the Huntsville city school system has discriminated against Black students in discipline, 2015 WL 13398941, at *3 &

24

n.4 (N.D. Ala. Apr. 21, 2015), and that it has denied Black students equitable access to advanced placement courses, 2017 WL 5483734, at *8 (N.D. Ala. Nov. 14, 2017).

## Senate Factor 6: Racial Appeals in Political Campaigns

74.    Politicians in Madison County have used overt and subtle racial appeals in elections. For example, Congressman Mo Brooks, who from 2011 to 2023 represented Alabama's Fifth Congressional District, including Madison County, has "repeatedly claimed that Democrats are waging a 'war on whites.'" *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1023 (N.D. Ala. 2022) (three-judge court), *aff'd sub. nom Allen v. Milligan*, 599 U.S. 1 (2023) (noting other examples of racial appeals).

## Senate Factor 7: Lack of Black Candidates Elected to Public Office

75.    As explained, no Black candidate has ever been elected to the at-large chairperson position, and no Black person has ever been elected to the Commission from a majority-White single-member district.

## Senate Factor 8: Unresponsiveness of the Commission to Black Voters

76.    Further, the Commission has been unresponsive to the concerns of Black voters. For example, Plaintiffs and other Black voters have repeatedly raised concerns about the at-large method of electing the chairperson, the Commission's intentional packing of Black voters into a super-majority Black District 6, the cracking of the Black community, and the dilutive redistricting of the six single-

member districts. Unfortunately, the Commission has chosen to ignore the concerns of Black voters.

**Senate Factor 9: The Justifications for the Enacted Plan are Tenuous**

77.    As explained above, under the current configuration of the districts in the Enacted Plan, traditional districting principles cannot justify the Commission's packing of Black voters into District 6 in much higher numbers than necessary to elect candidates of choice. Likewise, traditional districting principles do not explain the intentional cracking of the Black community in the City of Huntsville in a way that enables White-preferred candidates to consistently prevail in the remaining districts.

78.    The VRA requires legislative bodies to identify "[t]o what extent must we preserve existing minority percentages in order to maintain the minority's present ability to elect the candidate of its choice." *ALBC*, 575 U.S. at 279. A legislative body that seeks only to "maintain present minority percentages in majority-minority districts" without inquiring whether present circumstances still require such percentages has not adopted a reasonable compliance measure that is narrowly tailored to justify its race-based decision-making. *Id.*

79.    There is no legitimate reason why the Commissioners have ensured that District 6 has retained roughly the same Black voting age percentage since the 1980s,

26

and remains the only district in the County where Black voters have an opportunity to elect a candidate of their choice.

80.    Any justification for the at-large chairperson is also tenuous. There is no meaningful distinction between the role of chairperson and the other commissioners in Alabama law or in practice. Rather, the chairperson and the other commissioners all perform legislative functions similar to other commissions and they vote on policy decisions for any divisions and departments. Most of the other Alabama commissions that use single-member district systems do not elect their chairpersons at-large. Rather, commissioners will elect a chair or rotate as the chair. *See* Jim Blacksher et al., *Voting Rights in Alabama: 1982-2006*, 17 S. Cal. Rev. L. & Soc. Just. 249, 264–65 (2008).

## CLAIM FOR RELIEF

### Count One:
### The Enacted Plan Violates Section 2 of the Voting Rights Act of 1965
### 52 U.S.C. 10301; 52 U.S.C. 10302; 42 U.S.C. 1983
### (Vote Dilution)

81.    The allegations contained in the preceding paragraphs are alleged as if fully set forth herein.

82.    Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, as enforceable both pursuant to the private right of action authorized by Section 2 and pursuant to 52 U.S.C. § 10302 and 42 U.S.C. § 1983, prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or

procedure that results in the denial or abridgment of the right of any U.S. citizen to vote on account of race, color, or membership in a language minority group.

83. Voting in Madison County is racially polarized. Black voters in Madison County are politically cohesive and overwhelmingly support the same candidates in county elections. By contrast, the White majority usually votes as a bloc in county elections with the usual result of defeating Black voters' candidates of choice.

84. Whether or not the at-large chairperson is eliminated, Black voters in Madison County are sufficiently numerous and geographically compact enough to form an additional reasonably configured majority-Black Commission district.

85. Moreover, considering the totality of the circumstances in Madison County, Plaintiffs, which include Black voters in Madison County and organizations of which they are a part, have less opportunity than other members of the county electorate to participate in the political process and to elect representatives of their choice to the Commission.

86. Among other factors, there is a long history and ongoing pattern of discrimination in voting, education, and other areas against Black voters in Madison County, which impact Black voters' ability to participate equally in the political process; the Commission uses at-large elections and other practices that enhance the opportunity for discrimination; politicians in Madison County have deployed racial

appeals; Black people are underrepresented on the Commission; the Commission has been unresponsive to the concerns of Black voters in Madison County; and any justifications for the Commission's current structure and composition are tenuous.

87.    These facts demonstrate that the Enacted Plan dilutes Black voter strength in violation of Section 2 of the VRA, 52 U.S.C. § 10301 and 42 U.S.C. § 1983, and that Plaintiffs are entitled to all remedies available under federal law, see, e.g., 52 U.S.C. § 10302.

## PRAYER FOR RELIEF

88.    WHEREFORE, Plaintiffs respectfully request that the Court:

A. Declare the 6-1 plan, including the Enacted Plan and the at-large chairperson, to be illegal in violation of Section 2 of the VRA;

B. Permanently enjoin the Defendants and their agents from administering or otherwise holding elections for the Commission under the Enacted Plan;

C. Order expedited hearings and briefing, consider evidence, and take any other action necessary for the Court to order a VRA-compliant plan for the Madison County Commission;

D. Set an immediate and reasonable deadline for the Madison County Commission to adopt and enact a redistricting plan that (1) includes two majority-Black districts, or two districts that otherwise provide

Black voters with an opportunity to elect the candidates of their choice in compliance with the VRA; (2) does not dilute, cancel out, crack, pack, or otherwise minimize the voting strength of Black voters in Madison County; and (3) does not violate the VRA, federal and state Constitutions, and other applicable laws;

E. Award Plaintiffs their costs, expenses, expert fees, and disbursements, and all other reasonable attorneys' fees incurred in bringing this action pursuant to 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988;

F. Retain jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court; and

G. Grant such other and further relief as the Court may deem just and proper.

DATED this 3rd day of July, 2025.

Respectfully submitted,

/s/ Sidney M. Jackson
Sidney M. Jackson (ASB-1462-K40W)
WIGGINS CHILDS PANTAZIS FISHER & GOLDFARB, LLC
301 19th Street
North Birmingham, AL 35203
Phone: (205) 341-0498
Fax: (205) 254-1500
sjackson@wigginschilds.com

/s/ Brittany Carter
Brittany Carter*
Elizabeth Caldwell*
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
Phone: (212) 965-2200
bcarter@naacpldf.org
bcaldwell@naacpldf.org

I. Sara Rohani*
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
700 14th St. NW, Suite 600
Washington, DC 20005
Phone: (202) 682-1300
srohani@naacpldf.org

*Admitted pro hac vice